```
            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
                     FORT WORTH DIVISION

ELKIE LEE TAYLOR,                §
                                 §
        Petitioner,              §
                                 §
                                 §
VS.                              §   NO. 4:06-CV-459-A
                                 §
NATHANIEL QUARTERMAN,            §
DIRECTOR, TEXAS DEPARTMENT       §
OF CRIMINAL JUSTICE,             §
CORRECTIONAL INSTITUTIONS        §
DIVISION,                        §
                                 §
        Respondent.              §
```

## MEMORANDUM OPINION and ORDER

Came on for consideration the second petition for writ of habeas corpus ("petition")[1] filed by Elkie Lee Taylor ("Taylor"), an inmate in the Texas Department of Criminal Justice, Institutional Division, who is under sentence of death. The court has determined that the petition should be denied for the reasons set forth in this memorandum opinion and order.

### I.

### Procedural History

On March 18, 1994, an indictment was filed against Taylor in Tarrant County, Texas, for the April 2, 1993, murder of Otis Flake. The one-count indictment charged Taylor with the offense of murder during the course of committing and attempting to

---

[1] While the undersigned recognizes that 28 U.S.C. § 2254 contemplates the filing of an "application" for writ of habeas corpus, the practice of the Northern District of Texas has long been instead to use the term "petition." Consistent with this now ingrained practice, the undersigned refers to Taylor's application under 28 U.S.C. § 2254 for writ of habeas corpus as the "petition" and uses the term "petitioner" in lieu of "applicant."

commit the offense of robbery or, alternatively, in the course of committing and attempting to commit the offense of burglary of a habitation. Taylor was tried before a jury in the 297th District Court of Tarrant County and, on June 23, 2004, found guilty of a capital offense. The trial proceeded to the punishment phase and, on June 24, 1994, the jury returned its verdict of death. On June 29, 1994, the trial court signed a judgment consistent with the jury's verdict. On April 24, 1996, the Court of Criminal Appeals of Texas affirmed both the sentence and the judgment. See Taylor v. State, 920 S.W.2d 319 (Tex. Crim. App. 1996). And, on October 21, 1996, his petition for writ of certiorari was denied. See Taylor v. Texas, 519 U.S. 951 (1996).

On July 13, 1998, Taylor, through appointed counsel James A. Rasmussen, filed a state petition for writ of habeas corpus. On March 28, 2001, the petition was denied per curiam. See Ex parte Taylor, No. 48,498-01 (Tex. Crim. App. Mar. 28, 2001). Taylor then filed a federal petition for writ of habeas corpus on May 31, 2001. This court denied relief on July 13, 2001. The Fifth Circuit denied Taylor a certificate of appealability on August 9, 2001. The Supreme Court subsequently denied certiorari.

On June 20, 2002, the Supreme Court, in Atkins v. Virginia, 536 U.S. 304 (2002), held that the execution of the mentally retarded is unconstitutional and, specifically, constitutes cruel and unusual punishment under the Eighth Amendment. Based on Atkins, on January 16, 2003, Taylor filed a successive-writ application in the Texas Court of Criminal Appeals urging for the

2

first time that he is mentally retarded. The Texas Court of Criminal Appeals, in turn, remanded Taylor's mental-retardation claim to the trial court for further proceedings. After receiving documentary evidence, the trial court recommended that habeas relief be denied. The Texas Court of Criminal Appeals, however, remanded the case for an evidentiary hearing, which was held in June of 2005. After the hearing, the trial court again recommended denial of habeas relief, which recommendation was, this time, adopted by the Texas Court of Criminal Appeals. On April 10, 2006, Taylor sought authorization from the Fifth Circuit to file a second habeas petition. The Fifth Circuit granted his request on June 27, 2006, and this habeas proceeding ensued.

II.

Underlying Facts[2]

On April 2, 1993, Otis Flake, a mentally ill sixty-five-year-old black male who lived alone, was found dead sitting up against his bed, his hands tied behind his back with white plastic tubing, his feet tied together with a coat hanger, a T-shirt wrapped around his throat, and two coat hangers twisted around his neck from behind. Death was by strangulation. Mary Carson, a crack-addicted prostitute, testified that she had known the victim for four years, staying at his house at times. The

---

[2] In summarizing the underlying facts of the crime, the court has borrowed from the State's summary, which, in turn, was culled from the court-reporter's record on appeal. See Resp't's Resp. at 21-22. The underlying facts do not appear to be in dispute.

night before, she had been sitting on the victim's porch when Taylor and another man, Darryl Birdow, walked by.  She invited them in, and the three of them smoked crack cocaine while the victim was in another room.  Carson believed that Taylor was looking around the house for things to steal, so she told the men to leave.  She left soon after they did.  She returned two hours later to find the front door open and the house ransacked.  She saw Taylor and Birdow coming from the back side of the house and called out to them, but they ignored her.  Taylor had a white bag in his hand.  Inside the house, she found the victim.

While Taylor and Birdow were walking down the street with Flake's television set, they were stopped by a police officer, who asked where they were going with it.  Taylor told him they had gotten it from a man who had moved and left it behind, that it did not play and if the officer wanted to check it out somewhere, he could.  The officer told them okay and to go ahead.

At the time, Taylor was living with two prostitutes, dating one of them.  He told them on separate occasions about two different murders.  The first time, he said that he and Birdow had broken into the house of a Hispanic man (Ramon Carrillo). Taylor said that he told Carrillo not to look at him, but he did. First, Taylor tried to choke him, but when he did not die, Taylor hit him on the head with a rock and wrapped a coat hanger around his neck.  A few days later, when his girlfriend asked him if the police were in the neighborhood because of him, Taylor said that he had wrapped a coat hanger around a different man's neck and

4

that "dead men can't talk." The girlfriend noted that Taylor was "bold with it, smiled and laughed about it, like it was funny."

The Carillo murder occurred eleven days before the Flake Murder, seven blocks down the street, and the victim was also elderly and living alone. He was found with the coat hanger wrapped around his neck.

Taylor was arrested two days after Flake's murder. He tried to escape in the cab of an eighteen-wheel truck. He led police on a chase through Dallas and almost to Waco. Ultimately, troopers of the Texas Department of Public Safety shot out the truck's tires, causing the truck to stop and Taylor to be apprehended.

Taylor later gave written statements in which he admitted that he and Birdow had robbed both victims and that both had been killed by strangulation. Taylor maintained, however, that Birdow had killed both victims.

### III.

### Scope of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("the AEDPA"). Under the AEDPA, the

ability of federal courts to grant habeas relief to state prisoners is narrowly circumscribed:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, § 104(3) (codified at 28 U.S.C. § 2254(d)).

The AEDPA further provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

AEDPA § 104(4) (codified at 28 U.S.C. § 2254(e)(1)).

Having reviewed the petition, the response, the record, and applicable authorities, the court finds that Taylor's petition is without merit.

### IV.

### Ground for Relief

Taylor's sole ground for relief is that he is mentally retarded and therefore cannot constitutionally be executed under Atkins v. Virginia, 536 U.S. 304 (2002).

6

V.

Discussion

In Atkins, the Supreme Court did ban the execution of the mentally retarded. However, the Supreme Court also held that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317. The obvious challenge -- which the Supreme Court, in turn, left to the states to meet -- is how to determine which offenders falls within the range of mental retardation sufficient to render a sentence of death unconstitutionally cruel. Id.

Here, the State of Texas used a three-part definition borrowed from the American Association of Mental Retardation ("AAMR")[3] and generally codified in Section 591.003 of the Texas Health and Safety Code. Specifically, under this definition, a person is mentally retarded if he has three characteristics: (1) significantly subaverage general intellectual functioning (an IQ of about 70 or below); (2) related limitations in adaptive behavior, and (3) onset of the above two characteristics before age eighteen. See Ex Parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (quoting the AAMR definition of mental retardation). Although the first and third elements are relatively self-explanatory, the second element is perhaps not. Adaptive

---

[3] The Supreme Court cited to this definition in Atkins. See Atkins, 536 U.S. at 308 n.3. The State of Texas also uses this definition in death-penalty cases. See Ex Parte Briseno, 135 S.W.3d 1, 6-8 (Tex. Crim. App. 2004).

7

behavior generally refers to "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility of the person's age and cultural group." See Tex. Health & Safety Code Ann. § 591.003(1) (Vernon 2003). To state a successful claim under Atkins, all three prongs of the definition must be met. See In Re Salazar, 443 F.3d 430, 432 (5th Cir. 2006). And it is Taylor's burden, by a preponderance of the evidence, to show that each prong is met. See Hall v. State, 160 S.W.3d 24, 38 (Tex. Crim. App. 2004). If he fails to prove any one of them, Taylor's claim of mental retardation fails. See Clark v. Quarterman, 457 F.3d 441, 444 (5th Cir. 2006).

Both Taylor in his petition and the State in its response thoroughly review the voluminous evidence as to Taylor's mental capacity. There is no reason for the court to do so again here. Briefly, however, the specific evidence is that Taylor's IQ ranges somewhere between the mid-sixties and mid-seventies. The evidence, which was mostly elicited through Taylor's and the State's respective experts, concerning the remaining two requirements conflicts.

Regarding adaptive behavior, Taylor's evidence at best paints him as average and at worst serves to highlight how thin Taylor's case of mental retardation really is. Specifically, Taylor purportedly had difficulty maintaining a steady job, got confused using public transportation, had trouble cooking rice well as a child, made poor use of his leisure time by sitting in

8

his apartment and just listening to the radio and talking on the phone, and followed a woman he hardly knew to Texas. See Taylor's Pet. at 19-52.

In contrast, the State effectively points to, inter alia, the facts surrounding Taylor's commission of the two murders themselves as proof that he is not deficient in adaptive behavior. Having perceived an opportunity for robbing Flake, he planned and executed Flake's murder. Further, having learned from his experience of murdering Carrillo, Taylor skipped the use of his hands and went straight to the use of a coat hanger in order to murder Flake. When the policeman questioned him about the television, he quickly thought up a lie that worked. Then, when ultimately caught, he successfully maneuvered an 18-wheeler cab for over 150 miles and then, when caught, tried to blame someone else for his crimes. In light if this evidence, the trial court's conclusion that Taylor did not suffer from limitations in his adaptive behavior was hardly unreasonable. See 28 U.S.C. § 2254(d)(2).

Regarding the date of onset of Taylor's alleged mental retardation, the only IQ test taken of Taylor prior to his turning eighteen yielded a result of 75, above the mild-retardation cut off of 70. The administrator of the test even thought Taylor was capable of performing better than 75. While Talyor's expert opined that this test result overstated Taylor's IQ by seven points, the trial court was not unreasonable in finding otherwise. See 28 U.S.C. § 2254(d)(2). Nor was the

9

trial court unreasonable in finding that, even if Taylor were mildly retarded, he "is not so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."  See Atkins, 536 U.S. at 317.

In short, the trial court's findings of fact[4] against Taylor on his claim of mental retardation are presumed to be correct unless controverted by Taylor with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).  Taylor has failed to meet that burden here.

Finally, Taylor argues that the trial court's decision that he is not mentally retarded is contrary to, or involved an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(2).  Specifically, he attacks the trial court's reliance on Briseno.  He argues that Briseno represents a failure on the part of the Texas Court of Criminal Appeals to implement the Supreme Court's dictates in Atkins.  See Taylor's Pet. at 26-34 (citing Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004)).  Putting aside that some of Taylor's complaints about Briseno are just plain silly,[5] none is accompanied by any

---

[4] The court views the issue of Taylor's mental capacity as one of fact. See, e.g., Clark, 457 F.3d at 444 (question of whether criminal defendant suffers from significantly subaverage intellectual functioning is one of fact).  Even if viewed as a mixed issue of fact and law, for the reasons stated by the court, infra, the trial court's decision on this issue was not contrary to or otherwise involved an unreasonable application of clearly established federal law.  See 28 U.S.C. § 2254(d)(1).

[5] For example, Taylor complains that, under Briseno, the trial court is wrongly permitted to decide the ultimate issue of mental retardation.  He claims instead that the issue must be decided by experts.  See Taylor's Pet. at 32.  Obviously, as well illustrated by the presence of dueling experts in this very case, the court must be the ultimate fact finder of a defendant's mental capacity.

10

supporting legal authority.  Moreover, <u>Briseno</u> has been cited approvingly by the Fifth Circuit on numerous occasions.  <u>See</u>, <u>e.g.</u>, <u>Clark</u>, 457 F.3d at 444; <u>In re Hearn</u>, 418 F.3d 444, 446 (5th Cir. 2005); <u>Salazar</u>, 443 F.3d at 432.  Consequently, the trial court's reliance on <u>Briseno</u> does not warrant any substantive discussion.  The court is satisfied that Taylor has failed to carry his burden of showing that his sentence of death is unconstitutional.

## VI.
### Order

For the reasons discussed herein,

The court ORDERS that Taylor's petition be, and is hereby, denied.

SIGNED September 20, 2006.

    /s/ John McBryde
JOHN McBRYDE
United States District Judge

11